Sheryl P. Giugliano
Michael S. Amato
Ruskin Moscou Faltischek, P.C.
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, New York 11556-0190
(516) 663-6600
sgiugliano@rmfpc.com
mamato@rmfpc.com

*Proposed Counsel to Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>HAL LUFTIG COMPANY, INC.,<br><br>Debtor. | Chapter 11 (Subchapter V)<br><br>Case No. 22-11617 (JPM) |
| HAL LUFTIG COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FCP ENTERTAINMENT PARTNERS, LLC,<br><br>Defendant. | Adv. Pro. No. 22-01176 (JPM) |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 362(a) AND 105(a): (I) TO EXTEND THE AUTOMATIC STAY TO NON-DEBTOR HAL LUFTIG; (II) FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; (III) SETTING EMERGENCY HEARING DATE ON DEBTOR'S MOTION; AND (IV) FIXING THE FORM AND MANNER OF NOTICE**

RMF
RUSKINMOSCOUFALTISCHEK P.C.
*Counselors at Law*

1425 RXR PLAZA
UNIONDALE, NEW YORK 11556-1425

(516) 663-6600

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 3

I. THE ABSENCE OF THE PROTECTIONS OF THE AUTOMATIC STAY TO MR. LUFTIG POSE A SERIOUS THREAT TO THE DEBTOR'S REORGANIZATION........ 3

a. There Will be an Immediate Adverse Consequence to the Estate if the Stay is Not Extended to Mr. Luftig ........ 3

b. Luftig is Entitled to Absolute Indemnification by the Debtor ........ 8

c. Extending the Stay to Mr. Luftig Furthers the Purpose of the Bankruptcy Code ........ 9

II. EXTENSION OF THE AUTOMATIC STAY SHOULD BE GRANTED AS FCP'S BREACH OF CONTRACT CLAIM WAS DERIVATIVE OF MR. LUFTIG'S RELATIONSHIP TO THE DEBTOR AND FCP'S BREACH OF FIDICUARY DUTY CLAIM AGAINST MR. LUFTIG WAS DISMISSED ........ 10

III. THE DEBTOR DOES NOT HAVE AN ADEQUATE REMEDY AT LAW ........ 13

CONCLUSION........ 14

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*CAE Industries Ltd. v. Aerospace Holdings Co.*,
116 B.R. 31 (S.D.N.Y. 1990) .......... 11, 12

*DeSouza v PlusFunds Group, Inc.*,
2006 WL 2168478 (S.D.N.Y Aug. 1, 2006).......... 11

*In re Crilly*,
2020 WL 3549848 (Bankr. W.D. Okla. June 30, 2020).......... 14

*In re Metal Center Inc.*,
31 B.R. 458 (Bankr. D. Conn. 1983).......... 9

*New York TRW Title Ins. V. Wade's Canadian Inn & Cocktail Lounge, Inc.*,
605 N.Y.S.2d 139 (N.Y.App.Div. 1993).......... 13

*Mardice v Ebony Media Operations, LLC*,
2021 WL 146358 (S.D.N.Y. Jan. 15, 2021) .......... 9, 11

*Soley v. Wasserman*,
No. 08 Civ. 9262 (KMW)(FM), 2013 WL 5780814 (S.D.N.Y. Oct. 24, 2013).......... 13

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
803 F.2d 61 (2d Cir. 1986) .......... 10

*Thomson Kernaghan & Co.*,
2000 WL 640653 (S.D.N.Y. May 17, 2000) .......... 11

**STATUTES**

11 U.S.C. § 362(a) .......... 1

11 U.S.C. §105(a) .......... 1

Bankruptcy Code § 105.......... 14

Bankruptcy Code § 362 .......... 3, 14

**RULES**

Fed. R. Civ. P. 62(b) .......... 13

**OTHER AUTHORITIES**

55 N.Y. Jur.2d *Equity*, §24 (Updated Aug. 2013) .......... 13

S.Rep. No. 95–989, 95th Cong., 2d Sess. 54–55 (1978), reprinted in [1978] U.S.Code Cong. & Admin.News 5787, 5840–5841 .......... 9

Hal Luftig Company, Inc. (the "Debtor"), the above-captioned debtor and debtor-in-possession, respectfully submits: (i) this memorandum of law (the "Reply"); together with (ii) the Supplemental Declaration of Hal Luftig Pursuant to Bankruptcy Rule 9077 and Local Bankruptcy Rule 9077-1 (the "Supplemental Luftig Declaration")[1] in further support of the Debtor's *Memorandum of Law in Support of Debtor's Motion Pursuant to 11 U.S.C. §§ 362(a) and 105(a): (I) To Extend the Automatic Stay to Non-Debtor Hal Luftig; (II) For a Temporary Restraining Order and Preliminary Injunction; (III) Setting Emergency Hearing Date on Debtor's Motion ; and (IV) Fixing the Form and Manner of Notice* (Adv. Pro. ECF Doc. No. 3) (the "Motion") and in opposition to the *Memorandum of Law in Opposition to Debtor's Motion to Extend Automatic Stay* (Adv. Pro. ECF Doc. No. 11) (the "Opposition") and corresponding Declarations by John A. Mueller (Adv. Pro. ECF Doc. No. 12) (the "Mueller Declaration") and Warren Trepp (Adv. Pro. ECF Doc. No. 13) (the "Trepp Declaration").

## PRELIMINARY STATEMENT

As set forth below and in the Supplemental Luftig Declaration, the unusual, necessary, and exigent circumstances necessary for obtaining the relief requested in the Motion – extension of the automatic stay to non-debtor Hal Luftig – not only exist, but demonstrate how essential that relief is to the Debtor's successful reorganization. The Debtor's success and ability to generate revenue is entirely dependent upon Mr. Luftig – he is the person that daily attends important meetings and negotiations, reviews and interprets key documents, drives strategic marketing and advertising decisions, and physically markets and attends shows regularly in New York and on tour across the U.S. and overseas to supervise and manage their financial success. If Mr. Luftig is unable to

[1] All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Complaint filed December 1, 2022 (Adv. Pro. ECF Doc. No. 1), the Luftig Declaration (ECF Doc. No. 5), and the Supplemental Luftig Declaration.

continue his daily work for the Debtor because he is distracted by FCP's judgment enforcement and collection efforts, then the Debtor has little chance of success in this Subchapter V reorganization case.

Noticeably absent from the Opposition is a statement or assertion that FCP does not intend to disrupt Mr. Luftig's daily life or his business relationships with judgment enforcement collection efforts. Instead, FCP has demonstrated that it is actively pursuing every last interest Mr. Luftig owns in his individual capacity, and minimizes Mr. Luftig's life's work. The Opposition attempts to deflect attention to other joint ventures (which have been disclosed) to suggest the argument that Mr. Luftig is not essential to the Debtor's reorganization – a conclusion that could not be farther from the truth. In fact, Mr. Luftig's collaboration with U.K. producers in successfully moving *Life of Pi* from London's West End to Broadway *enhances* his ability to mount a London West End production of *Plaza Suite* through the Debtor for the benefit of all the Debtor's creditors including FCP.

It is in interests of all of the Debtor's creditors to extend the stay to Mr. Luftig. If Mr. Luftig has the time and ability to focus his efforts on identifying, developing and continuing new projects from the Debtor's established, highly successful productions, he will be able to generate revenue to fund a plan of reorganization. Notwithstanding FCP's incorrect and derogatory interpretation of the term "legacy" in referring to these successes, the Debtor recognizes (and implores this Court to appreciate) that those projects, stemming from prior Broadway productions, represent the best opportunity to generate revenue for the Debtor. New shows take months or years to generate profits for producers (if they are successful). New projects from successful legacy productions, however, are much more likely to generate profits for producers (including the Debtor), and those with historical knowledge and decades of experience (like Mr. Luftig) are crucial to their success. Unfortunately, FCP appears to be motivated by personal animus against Mr. Luftig and the Debtor,

rather than by FCP's economic interest or the economic interest of the Debtor's other creditors. Without a creditors' committee, the Debtor's fiduciary duty, to all creditors, is critically important.

Last, although FCP contradicts itself on this topic depending on the forum, there is a strong identity of interests between the Debtor and Mr. Luftig such that the Debtor is the real party in interest, and all efforts to enforce the Final Judgment and Order[2] against Mr. Luftig in effect constitute enforcement efforts against the Debtor. Additionally, Mr. Luftig is entitled to absolute indemnification pursuant to the Debtor's By-laws and New York law, and as such, enforcement of the Final Judgment and Order against Mr. Luftig creates significant claims against the Debtor's estate to the detriment of its reorganization efforts.

Therefore, as demonstrated in the Motion and below, special and unusual circumstances exist which warrant and require the extension of the automatic stay to Mr. Luftig.

## ARGUMENT

### I. The Absence of the Protections of the Automatic Stay to Mr. Luftig Pose a Serious Threat to the Debtor's Reorganization

This Reply and the Supplemental Luftig Declaration offer specific evidence of how and why the Debtor could not facilitate a successful reorganization in this Subchapter V case if Mr. Luftig is not given the opportunity to focus on revenue generating projects for the Debtor, and is instead distracted by FCP's enforcement of the Final Judgment and Order.

#### *a. There Will be an Immediate Adverse Consequence to the Estate if the Stay is Not Extended to Mr. Luftig*

Absent an extension of the automatic stay to Mr. Luftig there will be an immediate adverse consequence to the Debtor's estate. It requires a daily, consistent effort for the Debtor to produce

[2] On December 7, 2022, the District Court entered the Final Judgment and Order. (Supplemental Luftig. Decl. Exhibit A). The Debtor reserves all rights, remedies, and defenses with respect to the Final Judgment and Order and whether any portion thereof may be a violation of the automatic stay under Bankruptcy Code §362.

and keep running a successful show – legacy or otherwise – and Mr. Luftig is the only person capable of doing so. Mr. Luftig dedicates many hours each day to the Debtor's legacy projects, including hands-on producing and marketing efforts in order to generate revenue for the Debtor, which are essential to the Debtor's reorganization. If Mr. Luftig is instead focused on repairing business relationships and defending judgment enforcement collection efforts by FCP, he cannot possibly continue the daily work that is necessary for the Debtor's successful reorganization.

FCP's deliberate attempt to attach a negative connotation to the word "legacy" should be ignored by the Court,[3] because it is the Debtor's legacy projects currently generating the most distributable funds for the Debtor. Specifically, the Debtor has nine (9) projects stemming from legacy projects.[4] They include critical and financial hits with a proven track record of revenue streams. New shows – if they are successful at all – typically take years to generate a profit for investors and producers. New projects stemming from proven legacy productions, which have already recouped funds for investors and have moved on to disbursing profits, are far more lucrative for producers like the Debtor. Experienced and successful producers like Mr. Luftig understand and thrive with that knowledge.

By way of example and not limitation, the Debtor is the General Partner of, and owns 15.7315% of the interests in Kinky Boots LLC, the holding company for all Kinky Boots project. Profits for Kinky Boots on any new projects flow up to the holding company and are disbursed to its investors and producers, including the Debtor.[5] Kinky Boots grossed over $318 million during

---

[3] It is curious, therefore, that FCP appears unconcerned with impeding the Debtor's efforts to produce revenue which will directly benefit FCP and help pay FCP's unliquidated claim.

[4] The Debtor's nine (9) current projects stemming from legacy productions are: (1) Plaza Suite; (2) Fiddler on the Roof in Yiddish; (3) Kinky Boots; (4) Legally Blonde; (5) Thoroughly Modern Millie; (6) Catch Me If You Can; (7) David Byrne's American Utopia; (8) Rent North American Tour; and (9) Becoming Nancy.

[5] Under the Final Award, the arbitrator found that in addition to compensatory damages, FCP is entitled to 55% of the profits generated from the Debtor's 15.7315% interest in Kinky Boots LLC pursuant to a direction letter. On December 7, 2022, after the Petition Date, the District Court entered the Final Judgment

its run on Broadway. As of 2021, Kinky Boots has distributed over $40 million in profits to its shareholders, not including distributions from international companies.

Between April 2022 and November 2022, there was a running Off Broadway revival of "Kinky Boots," which distributed royalty and other fees to Kinky Boots LLC. Mr. Luftig worked approximately six (6) hours a day on marketing, advertising, and responding to issues with an Off Broadway revival production opening and running during a global pandemic such as not having enough cast members due to illnesses and working creatively to ensure that the show continued. Mr. Luftig worked tirelessly with the show's marketing team to pivot the message to potential customers.

Recently, Mr. Luftig has been working on a potential new U.S. tour of Kinky Boots. Some cities outside New York invested money in the Kinky Boots revival. Mr. Luftig spends time daily speaking and meeting, both in-person and remotely, with representatives from those cities to explain how and why the show could be a success in their respective cities.

Mr. Luftig is also currently negotiating theater availability in Seoul for another return of Kinky Boots in 2024/2025, as well as deal negotiations for further returns of Kinky Boots in Japan in 2025, all of which would result in additional revenue to the Debtor (if successful).

In addition, Mr. Luftig recently received a call from someone interested in producing Kinky Boots in the United Kingdom as a "non replica" show. A "non replica" show means producing a show that uses the exact music and words from Kinky Boots, but not the same direction, staging, costumes, sets, or lights – that is, nothing else can mirror the Broadway show. It is Mr. Luftig who takes those types of calls, but more importantly, he is the person who reviews the relevant agreements and contracts for the show rights, speaks to parties and conducts negotiations necessary

---

and Order. The Debtor reserves all rights with respect to the Final Judgment and Order, including any possible violations of the automatic stay thereunder.

for exceptions or waivers, confirms that there will be no violations, and then visits the performances to watch and verify that the non replica show is not copying what was on Broadway. There is no other person in the Kinky Boots production team, at the Debtor or otherwise, who could or would be able or willing to do that work.

The Debtor is also the General Partner for and owns 11.5% of the interests in Suite 719 LLC, the production company for "Plaza Suite" a limited engagement on Broadway starring Matthew Broderick and Sarah Jessica Parker. Plaza Suite grossed almost $29 million on Broadway after playing for only 20 weeks. As of November 2022, Plaza Suite has distributed 236% of capitalization to shareholders with further distributions planned for December 2022 and the first half of 2023. The Debtor became General Partner and was entrusted with that position because of Mr. Luftig. Mr. Luftig is tasked with making all management decisions for Suite 719 and is responsible for its failures, if any. Plaza Suite is exploring the possibility of launching shows in London and Los Angeles, which requires significant lead work by its producer, the Debtor (which really means Mr. Luftig). Mr. Luftig is the sole person responsible for, trusted with, and capable of identifying suitable venues, negotiating contracts and agreements with talent and support teams, and working with marketing and advertising specialists to ensure that the shows are promoted with an effective message.

In addition, Suite 719 obtained $10 million from the Shuttered Venue Operators Grant program (part of the CARES Act), and is in the midst of a government audit concerning its use of government funds. Mr. Luftig is responsible for responding to audit requests, and he is the only person who can do so, because he is the person who ensured that Suite 719 used the funds appropriately.

Many aspiring producers only dream of having one such hit show in their career. Due to Mr. Luftig's long, hard work the Debtor has had several and they continue to generate revenue for

the Debtor. If he is enabled to continue that work with the requested stay, the Debtor has a better chance of making a more significant payment to all of its creditors, including FCP.

"Fiddler on the Roof in Yiddish" is another of the Debtor's "legacy" productions. Mr. Luftig is working to bring this show back to life in New York, which means identifying a suitable theater, creating marketing materials and messages, and implementing the marketing campaign. This is a project which could generate significant revenue for the Debtor's creditors, but will only transpire if Mr. Luftig can commit a significant portion of his time and attention to the project.

Each of these legacy productions – Kinky Boots, Plaza Suite, Fiddler and there are more – has ongoing projects which require Mr. Luftig's daily attention. If Mr. Luftig is forced to instead turn his attention to post judgment enforcement collection efforts and defending and explaining them to his colleagues, contacts and investors in the industry, he will not be able to give the same attention to the Debtor.

On the contrary, such collection efforts would needlessly impair Mr. Luftig's professional effectiveness built over three decades, killing the goose that lays the golden eggs for the Debtor. Mr. Luftig is not merely one of many executives in a large company who is important but not really essential to the business reorganization. On the contrary, Mr. Luftig is the sole individual who can fulfill the roles described above and in the Supplemental Luftig Declaration.

This Court should not be distracted by FCP's self-serving, conclusory and misleading allegations that Mr. Luftig is only focused on pursuing new opportunities, or that his pursuit of separate, new ventures is somehow wrong or improper. Since termination of the 2007 Agreement on January 1, 2015, Mr. Luftig has invested in shows and/or produced shows through the Debtor, in his individual capacity, and though other joint business ventures. Mr. Luftig disclosed this in the Luftig Declaration, and there is nothing improper about deciding not to produce new shows though an entity which is embroiled in a nasty arbitration and litigation, and with whom FCP

terminated its agreement nearly eight years ago. The suggestion that either the Debtor or Mr. Luftig has improperly transferred or taken an opportunity of the Debtor's is false.

Last, FCP points to the fact that the Debtor did not argue in the Motion that Mr. Luftig will contribute personal assets to the reorganization process. A plan discussion is premature.[6] The Debtor has not had the opportunity to begin to negotiate and formulate a plan, but Mr. Luftig will contribute personal assets to help fund a plan of reorganization which finally resolves all of FCP's claims, and provides Mr. Luftig with a third party release (limited to FCP's judgment) and claims. Mr. Luftig's counsel has informed him that a third party release is not routinely granted and requires a significant contribution to the plan.

Based upon the foregoing, the Debtor respectfully submits that those are the "special" and "unusual" circumstances necessary to warrant extending the automatic stay to Mr. Luftig.

### *b. Luftig is Entitled to Absolute Indemnification by the Debtor*

Mr. Luftig is entitled to indemnification from the Debtor as a result of any and all enforcement efforts by FCP, including attorneys' fees and expenses, under applicable corporate organizational documents and New York State law. (Supplemental Luftig Decl., Exhibit B). FCP highlights the fact that the Debtor did not physically attach its By-laws to the Motion or the Luftig Declaration. The Debtor's By-laws, Article VI, Section 5 "Indemnification of Directors and Officers" states as follows:

> Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he . . . then, is, or was a director or officer of the corporation in any capacity at the request of the Corporation, shall be indemnified by the Corporation against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with the defense of such action or proceeding or in connection with an appeal

[6] The Debtor is hopeful that FCP is ready to engage in good faith plan negotiations, with the assistance and input of the Subchapter V Trustee, to reach agreement on a consensual chapter 11 plan which will obviate the need for litigation in this case and judgment collection against Mr. Luftig.

> therein, including attorney's fees actually and necessary[sic] incurred as a result of such action, to the fullest extent permissible by the laws of the State of New York if such director or officer acted in good faith, for a purpose which he reasonably believed to be in, or, not opposed to, the best interests of the Corporation. . . . Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

Supplemental Luftig Decl., Ex. B.

The Debtor's By-laws clearly establish that Mr. Luftig is entitled to "absolute indemnification" by the Debtor, and it has been demonstrated that absence of the stay as to Mr. Luftig will significantly and adversely impact the Debtor's reorganization efforts. *See Mardice v Ebony Media Operations, LLC,* 2021 WL 146358 at *5 (SDNY Jan. 15, 2021).

***c. Extending the Stay to Mr. Luftig Furthers the Purpose of the Bankruptcy Code***

"The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." S.Rep. No. 95–989, 95th Cong., 2d Sess. 54–55 (1978), reprinted in [1978] U.S.Code Cong. & Admin.News 5787, 5840–5841. "Where . . . a debtor and a nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code." *In re Metal Center Inc.*, 31 B.R. 458, 462 (Bankr. D. Conn. 1983).

FCP incorrectly contends that extending the stay to Mr. Luftig does not further the purpose of the Bankruptcy Code because FCP already has obtained the Final Judgment and Order, there are no "mounting discovery and pretrial costs or 'realities of modern litigation' facing [Mr.] Luftig", and there are not thousands of pending lawsuits against Mr. Luftig. But each request to

extend the stay to a non-debtor must be determined on a case by case basis, upon the facts of the individual case. Indeed, FCP fails to cite any authority to support its position that one must have "thousands" of law suits pending against you to obtain the protection of the automatic stay, and ignores the invasive and disruptive nature of judgment enforcement proceedings.

Finally, as demonstrated above, Mr. Luftig is entitled to indemnification from the Debtor and, thus, the automatic stay should be extended to further the purpose of the Bankruptcy Code to provide critical relief to the Debtor.

**II. Extension of the Automatic Stay Should be Granted as FCP's Breach of Contract Claim was Derivative of Mr. Luftig's Relationship to the Debtor and FCP's Breach of Fiduciary Duty Claim against Mr. Luftig was Dismissed**

It is within a court's discretion to extend the automatic stay "in the interest of justice and in control of their dockets." *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986). Although the arbitrator held that Mr. Luftig and the Debtor are jointly and severally liable to FCP, it is within the interests of justice for the Court to extend the automatic stay to Mr. Luftig, because FCP's breach of contract claim (the basis of the Final Judgment and Order) was derivative of Mr. Luftig's role as President and sole shareholder of the Debtor, as the 2007 Agreement was between FCP and the Debtor (not Mr. Luftig individually). Further, FCP's breach of fiduciary duty claim asserted against Mr. Luftig in the Arbitration was dismissed. Indeed, there was no act or omission of Mr. Lufitg individually which serves as the basis for the Final Judgment and Order.

The cases cited in the Opposition in support of FCP's argument that the stay should not be extended to Mr. Luftig because he is independently liable are distinguishable from the present case. Each of those cases cited in the Opposition involved claims against the non-debtor defendant which were not derivative of their relationship to the debtor, but rather based upon their own personal conduct. *Thomson Kernaghan & Co.*, 2000 WL 640653, at * 15 (SDNY May 17, 2000)

(declining to stay claims against non-debtor defendant where such claims were not "derivative of his status as Chairman and Chief Executive Officer of [debtor]," but rather were premised upon his "own conduct, including an alleged breach of his fiduciary duty"); *Mardice v. Ebony Media Operations, LLC,* 2021 WL 146358, at *4 (S.D.N.Y. Jan. 15, 2021) (declining to extend the stay where non-debtor defendants failed to establish that their liability would be derivative to their relationship to the debtor); *DeSouza v PlusFunds Group, Inc.,* 2006 WL 2168478 at *3 (SDNY Aug. 1, 2006) (declining to extend stay given the fact that liability could rest upon non-debtors' own breaches of duty on plaintiff's fraudulent conveyance, tortious interference, and conversion claims).

The Opposition incorrectly contends that this case is analogous to *CAE Industries Ltd. v. Aerospace Holdings Co*., 116 B.R. 31 (S.D.N.Y. 1990). In *CAE Industries Ltd.*, the claims against the non-debtor individual were not derivative, but were based upon his individual activity while he was CEO, Chairman and Director, and after, continuing to the date of the case. *CAE Industries Ltd. v. Aerospace Holdings Co*., 116 B.R. 31 (S.D.N.Y. 1990). The district court noted that CAE could have pursued its tort claims solely against the non-debtor. *Id.* Here, the breach of contract claim asserted by FCP against Mr. Luftig was derivative of his relationship to the Debtor, as President and sole shareholder. The arbitrator did not identify any actions (improper or otherwise) by Mr. Luftig, in his individual capacity that made him liable to FCP separate and distinct from his actions for and on behalf of the debtor. Mr. Luftig was not a party to the 2007 Agreement, and thus, FCP could not have pursued its breach of contract claim solely against Mr. Luftig. In fact, FCP argued in both the Arbitration and the District Court that the Debtor and Mr. Luftig were one and the same, and thus, are judicially estopped from arguing that Mr. Luftig is liable separate from his relationship with the Debtor.

Here, in stark contrast to *CAE Industries:* (1) Mr. Luftig is not a former director, he is one

of three employees, the sole shareholder who has consistently invested in and loaned money the Debtor, and the current and future revenue driving force of the Debtor's business; (2) Mr. Luftig is the sole officer of the Debtor, he is not one of many who can be replaced or substituted whenever he is distracted by post judgment enforcement collection proceedings; and (3) the arbitrator's Interim Award and the Final Award confirmed that Mr. Luftig was not liable for breach of fiduciary duty, and although he was found jointly and severally liable to FCP for breach of the 2007 Agreement, he was not a party to the 2007 Agreement.

This Court should not be misled by FCP's gross mischaracterization of the Inducement Letter and believe it was an opportunity for FCP to hold Mr. Luftig individually liable for the Debtor's breach of the 2007 Agreement, even though he was never a party to it. Such letters are standard in the entertainment industry, and are meant only to ensure that the talent being hired in fact provides the services promised, regardless of what happens to the corporate entity. Inducement letters (unless otherwise drafted) are not designed or intended to allow contracting counter-parties to cherry-pick when and how to hold the talent personally liable. Further, as noted in the Arbitration, FCP never elected under the Inducement Letter to hold Mr. Luftig personally responsible for the Debtor's obligations under the 2007 Agreement.

Although the arbitrator found Mr. Luftig and the Debtor were jointly and severally liable to FCP for damages, unlike *CAE Industries*, the Final Award does not set forth any legal basis for finding Mr. Luftig individually liable for breach of the 2007 Agreement to which he is not a party. Furthermore, the only non-contract claim asserted against Mr. Luftig individually, breach of fiduciary duty, was dismissed. Therefore, FCP has no claims against Mr. Luftig for his personal conduct.

Furthermore, the standard of vacating an arbitration award is not the standard of the Motion to extend the stay to Mr. Luftig, and thus, has no bearing on whether this Court should extend the

stay to Mr. Luftig.

Based upon the foregoing, this Court should enter an order extending the automatic stay to FCP's efforts to enforce the Final Judgment and Order against Mr. Luftig.

**III. The Debtor Does Not Have an Adequate Remedy at Law**

FCP incorrectly contends that the Debtor has an adequate remedy at law because Mr. Luftig could pursue a stay of enforcement of the judgment pending the appeal of the Final Judgment and Order pursuant to Fed. R. Civ. P. 62(b). However, a stay pursuant to Fed. R. Civ. P. 62(b) requires the posting of a bond (for a $2.6 million judgment), a significant financial hardship for Mr. Luftig which is simply impossible.

Fed. R. Civ. P. 62(b) is not an adequate remedy at law as it only stays enforcement of a judgment while pursuing an appeal, and does not offer a realistic alternative to Mr. Luftig. "A legal remedy is adequate if it is 'as sufficient, full, prompt, complete, and efficient to attain the ends of justice and its prompt administration as the remedy in equity.'" *Soley v. Wasserman*, No. 08 Civ. 9262 (KMW)(FM), 2013 WL 5780814 (S.D.N.Y. Oct. 24, 2013) (quoting 55 N.Y. Jur.2d *Equity*, §24 (Updated Aug. 2013); *New York TRW Title Ins. V. Wade's Canadian Inn & Cocktail Lounge, Inc.*, 605 N.Y.S.2d 139, 140 (N.Y.App.Div. 1993)) (citations omitted).

To stay enforcement efforts pending the appeal, Mr. Luftig would be forced to post bond in the amount of at least $2.6 million, or pay a more significant premium and post significant personal collateral. In addition, if Mr. Luftig's appeal is unsuccessful – not because he should be personally liable for breach of a contract to which he was not a party, but because of the inherent difficulties in vacating an arbitration award – he would lose the entirety of his collateral and be entitled to significant indemnification claims against the Debtor. This can hardly be viewed as an adequate remedy at law. Further, the Debtor seeks to stay enforcement of the judgment against Mr. Luftig pending its reorganization, not the pendency of the appeal. The appropriate relief

required under the circumstances is to grant the Motion and stay the enforcement of the Final Judgment and Order against Mr. Luftig pursuant to §§ 362 and 105 of the Bankruptcy Code.

FCP disingenuously suggests that this Motion is a "half-hearted attempt to circumvent the proper procedure of posting a bond or other security." The case cited by FCP, *In re Crilly*, 2020 WL 3549848 (Bankr. W.D. Okla. June 30, 2020), is inapplicable. In *In re Crilly*, the debtor filed for bankruptcy twice and sought an extension of an automatic stay after the first case was dismissed. *In re Crilly*, 2020 WL 3549848, at *9 (Bankr. W.D. Okla. June 30, 2020). The court in *Crilly* found that the second case was filed in bad faith, and that the debtors "masterfully manipulated" the Bankruptcy Code for twenty months to serve their purpose of staying collection activities without the necessity of posting an appeal bond or being required to pay anything on the judgment. *Id*. The underlying judgment comprised over 90% of the debtor's debt, did not arise from commercial or business activities of the debtors, nor was it incurred for the purposes of making a profit, but for personal reasons. *Id*. Here, this is the Debtor's first bankruptcy filing, the Debtor is proceeding under Subchapter V as a reorganization case with an expedited, streamlined process to allow more funds to be paid to the Debtor's creditors, and in good faith, the Debtor moved to extend the automatic stay to Mr. Luftig. FCP's unliquidated claim is the largest claim in the case which arose from the Debtor's business activities. Moreover, the Debtor seeks to reorganize and that requires Mr. Luftig's personal efforts and dedication.

**CONCLUSION**

The automatic stay under Bankruptcy Code § 362 should be extended to Mr. Luftig during this Subchapter V small business reorganization case because he is the lifeblood of the company and as the sole shareholder, officer and director, and has valid indemnification claims against the Debtor's estate. Based upon the Debtor's and Mr. Luftig's aligned interests, and the potential adverse economic consequences for the Debtor's potential reorganization and estate absent

extension of the stay to Mr. Luftig, this Court should enter the proposed TRO and Preliminary Injunction.

Dated: Uniondale, New York
December 14, 2022

RUSKIN MOSCOU FALTISCHEK, P.C.
*Proposed Attorneys for Debtor and Debtor in Possession*

By: *s/ Sheryl P. Giugliano*
Sheryl P. Giugliano
Michael S. Amato
1425 RXR Plaza
East Tower, 15th Floor
Uniondale, NY 11556-1425
(516) 663-6600

989261